## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 07-0029 |
| | : | |
| SHEAR NOBLES | : | |

### MEMORANDUM OPINION

**Savage, J.**                                                     **September 27, 2007**

The events leading up to the arrest of the defendant started with the attempted robbery of a Chinese food store at 44th and Chestnut Streets in Philadelphia on July 17, 2006.  Ten minutes later, the victim identified the defendant as the robber at 47th and Locust Streets, five blocks away, where the police had stopped the defendant because he matched the description of the robber that had been broadcast over police radio.  An ammunition magazine found at the store fit the gun recovered a few feet from the defendant.

The defendant moved to suppress the gun and the ammunition, the identification by the victim and an incriminating statement given by him after his arrest.  After an evidentiary hearing and oral argument, the motions were denied.  This memorandum opinion supplements the findings of fact and explains the rationale for the denial of the motion.

Responding to a radio call of a robbery in progress received at 10:54 p.m., Philadelphia Policemen Kingkiner and Kotto went to 4401 Chestnut Street where they were met by the store owner and his wife.  Kingkiner took a report from the owner, his wife and three witnesses who reported that a lone gunman attempted to rob the owner who struggled with the man.  They described the gunman as Black, 5'7" tall, 17-19 years of age,

wearing a black Dickies shirt over a white T-shirt and black pants.

While Kingkiner was interviewing the people at the scene, Kotto surveyed the store. He found a gun magazine on the floor.

Kingkiner broadcast the description of the gunman over police radio. Sergeant Odell Kyler, at the nearby police station, heard the broadcast and proceeded in a police vehicle with Police Officer Marta Montego to check the neighborhood for the suspect. They were looking for a Black male with a gun wearing a black Dickies shirt, black Dickies pants, black shoes and a white T-shirt.

At the area of 47th and Locust Streets, Kyler and Montego saw the defendant walking southbound on the west sidewalk of 47th Street towards Locust Street. Montego pointed the defendant out, who was then wearing black clothing, exclaiming, "There he is." As Kyler pulled the police vehicle over to the curb after passing the defendant who had turned the corner, Montego got out of the car and yelled to the defendant, "Stop, let me see your hand." Kyler observed the defendant walking with a black Dickies shirt draped over his right arm, covering his right hand.

When Montego instructed the defendant to stop, he was 10-15 feet away from the police vehicle. Despite the instruction, he continued to walk an additional few feet before stopping. In the meantime, he discarded the black Dickies shirt. Kyler frisked the defendant while Montego retrieved the shirt, which was a few feet from the defendant.

As Policeman Anthony Lazarro arrived at the scene of 47th and Locust Streets, he heard Montego warning the defendant to display his hands. Once the defendant was stopped at Kyler's police vehicle, Lazarro walked around the area and found a handgun about 3 feet from where the defendant had stopped in response to Montego's warning.

2

Kingkiner heard a radio report that other officers had a suspect in custody at 47th and Locust Streets.  With the victim whom he was transporting to police headquarters, Kingkiner went to 47th and Locust Streets where the defendant was standing on the sidewalk next to a police car.

Kingkiner asked the victim whether the defendant was the person with whom he had struggled and who had injured his hand.  In response, the victim identified the defendant who was then wearing a white T-shirt, black pants and black sneaks.

The police then arrested the defendant and placed him in a police car.  Montego obtained biographical information for the purpose of filling out an arrest report.  While talking to Montego, the defendant, without having been given any *Miranda* warnings, asked her how much time she thought he would get for the gun.

<u>The Seizure</u>

The defendant contends that he was seized when the police ordered him to stop while he was walking on the sidewalk and that the seizure was without reasonable suspicion.  He argues that the information regarding the description of the suspect that the police had at that time was insufficient to justify the stop.  Consequently, he maintains the evidence subsequently obtained by the police must be suppressed as the product of the illegal seizure.

Before the police may stop a person they must have a reasonable, articulable suspicion that that person committed or is committing a crime.  *Terry v. Ohio*, 392 U.S. 1, 31 (1968); *United States v. Brown*, 448 F.3d 239, 244 & n. 7 (3d Cir. 2006).  The police must have an objective and particularized basis for suspecting that person.  *Brown*, 448 F.3d at 246.  This reasonable suspicion, considering the totality of the circumstances, may

3

result from either one or more of the following factors: specialized knowledge and investigative inferences, personal observation of suspicious behavior, information from reliable sources, and from sources that prove by the accuracy and intimacy of the information provided to be reliable as to the details of the tip. *Id.* at 247.

The officers had a reasonable suspicion to stop and question the defendant regarding the robbery. The description of the robber's clothing was detailed and specific. The defendant was wearing the same color and type of clothing described by the victim and witnesses to the crime. A robbery had occurred within minutes of the sighting of the defendant only three blocks from the scene. The defendant was the only person matching the description in the area along the path taken by the robber.

The description of the gunman was detailed and not merely general. It described a 5'7" Black man wearing distinctive clothing. It was not just black pants and black shirt. It was a specific brand - a Dickies black outfit.

The description was supplied by a person intimately involved - the victim of the attempted robbery who had had a face-to-face encounter with the gunman and relayed the information almost immediately after the event. He transmitted the description directly to the police at the scene. He could be held accountable for giving a false or faulty report. Considering all the facts about the information, the honesty of the victim and the basis of his knowledge, the tip about the crime and the description of the perpetrator were reliable, and provided objective facts that established reasonable suspicion in the mind of a reasonable, trained officer.

Before Kyler and Montego stopped the defendant, they observed him carrying a black shirt draped over his arm, concealing his hand. They had been advised that the

4

suspect sought by the police was armed with a gun.  Consequently, they suspected he had a gun under the shirt.  This suspicion supplemented the clothing and physical descriptions of the defendant, adding to a reasonable and articulable objective basis for stopping him.

### The Gun

Regardless of when the defendant was seized, the gun recovered a few feet from him was not a fruit of that seizure.  The defendant never asserted a possessory interest in the gun which was found on the ground.  It was not in the defendant's possession nor was there any evidence at the time of its recovery linking it to the defendant.  The police did not see the defendant throw it or hear it fall to the ground.  Hence, it either had been abandoned by the defendant or belonged to someone else.

An individual has no reasonable expectation of privacy in abandoned property.  *Abel v. United States*, 362 U.S. 217, 241 (1960); *see also California v. Hodari D.*, 499 U.S. 621, 629 (1991).  However, abandonment may be involuntary where it results from police misconduct, such as an illegal search or seizure, deceit or a pattern of harassment.  *United States v. Fulani,* 368 F.3d 351, 355 (3d Cir. 2004).  In that instance, it may be suppressed. *Id*.  Because the stop of the defendant was not illegal, abandonment of the gun was not the product of police misconduct.

### The Identification

The victim of the attempted robbery identified the defendant while he was standing on the sidewalk next to a police car.  At that time, within minutes of the crime and close to the scene of the crime, the defendant was wearing clothing matching that of the gunman who had just minutes ago struggled with the victim.

The identification process was not unnecessarily suggestive and did not create a

5

substantial risk of a misidentification.  Granted the defendant was the only person other than uniformed police officers that were present.  However, he was not in handcuffs and the police did not suggest that he was a suspect or the robber.  In short, the police did nothing to induce the victim to identify the defendant.

The victim had had an opportunity to get a good look at the gunman.  He struggled with him, coming face-to-face with him at the doorway to the store.  He immediately gave a detailed description of the man to the police, describing his build and distinctive clothing. He did not equivocate in identifying him when he saw him again a short time later.

Given the totality of the circumstances surrounding the identification and its basis, the identification was reliable and not unduly suggestive.  The identification did not violate the defendant's due process rights because it was reliable and was not unnecessarily suggestive.  *See Manson v. Brathwaite,* 432 U.S. 98, 113-114 (1977).  The identification procedures did not violate due process because they were  not "unnecessarily suggestive" and did not create a "substantial risk of misidentification."  *Neil v. Biggers,* 409 U.S. 188, 198-199 (1972); *United States v. Emanuele,* 51 F.3d 1123, 1128 (3d Cir. 1995).  Examined in light of the totality of the circumstances, the identification procedures in this case were reliable.  *Government of Virgin Islands v. Riley*, 973 F.2d 224, 228 (3d Cir. 1992). Considering the complainant's original opportunity to observe the defendant, the accuracy of the initial description, the degree of certainty when viewing the defendant at the show up, and the elapsed time between the crime and the identification procedures, the identification of the defendant by the victim was reliable.  *See Neil,* 409 U.S. at 199-200; *Emanuele,* 51 F.3d at 1128.

## The Statement

After the defendant was identified and placed under arrest, he was interviewed by Montego to obtain biographical information to initiate the arrest paperwork.  During this interview, he asked the officer how much time he would get for the gun because he had a police record.

The defendant was not given his *Miranda* warnings.  However, they were not necessary because the police never asked the defendant any questions or otherwise solicited information about the gun, the attempted robbery or any other crime. *Pennsylvania v. Muniz,* 496 U.S. 582, 600-601 (1990); *United States v. Bishop*, 66 F.3d 569, 572 n.2 (3d Cir. 1995); *see also United States v. Fioravanti*, 412 F.2d 407, 412-413 (3d Cir. 1969).  The defendant voluntarily and without any prompting asked the question that implied an incriminating fact - that he had had the gun.  The statement was not the product of any police manipulation or coercion.  Thus, the defendant's statement in the form of a question was admissible.

## Conclusion

The police did not violate the defendant's constitutional rights in stopping and arresting him.  Nor did Officer Montego solicit or otherwise induce the defendant's voluntary inculpatory statement.  The victim's identification of the defendant shortly after the stop was reliable and not the product of an unduly suggestive process.  Therefore, the defendant's motions to suppress evidence were properly denied.